CACI, INC.—FEDERAL, Plaintiff,

v.

The UNITED STATES, Defendant.

No. 1–83C.

United States Claims Court.

Feb. 2, 1983.

Joseph S. Wager, Washington, D.C., for plaintiff; Jeffrey P. Elefante, Keck, Mahin & Cate, Washington, D.C., and Michael S. Friedman, Arlington, Va., of counsel.

Lenore C. Garon, Washington, D.C., with whom was Asst. Atty. Gen. J. Paul McGrath, Washington, D.C., for defendant.

OPINION

SPECTOR, Judge:

Both counsel and the court have brought this case to the point of decision on an expedited basis, for reasons which are mandated by the nature of the proceeding.

On January 3, 1983, plaintiff filed a complaint herein for declaratory and injunctive relief, together with a motion for a preliminary injunction and an application for a temporary restraining order. In a conference call that same day, defendant's counsel represented that an award of the contract

at issue would not be made for at least 2 weeks, and counsel thereupon agreed upon a hearing one week later, namely, January 10, 1983. This agreement rendered moot plaintiff's application for a temporary restraining order and it was therefore denied as unnecessary.[1] Defendant's counsel was afforded until January 7, 1983 to respond to plaintiff's motion for a preliminary injunction and complaint for declaratory relief, and she did so on January 10, 1983, just prior to the hearing scheduled for that date. Defendant's response also included a motion to dismiss, or in the alternative, for summary judgment.

Counsel had been directed[2] to advise the court no later than January 6, 1983 regarding the scope of the hearing which they had requested for January 10, 1983, since under Rule 65(a)(2), the court may "order the trial of the action on the merits to be advanced and consolidated with the hearing of the application" for a preliminary injunction. Although they initially advised on January 6, 1983 that they did not want advancement and consolidation of the action on the merits, both parties appeared on January 10, 1983 with their complement of witnesses and exhibits and, with the court's approval, reversed their prior decision.[3]

In the 2 days of trial which followed, the testimony of 16 witnesses was taken, and a number of exhibits were introduced.[4] Plaintiff was afforded until January 18, 1983 to reply to defendant's response, and to respond to defendant's motions to dismiss, or for summary judgment. Counsel were directed to file simultaneous briefs on the merits on January 25, 1983, which they have done.[5]

In the course of trial on January 10–11, 1983, the contracting officer testified that he would not be able to make an award of the contract, in the normal course, any sooner than 3 weeks after return of the files by his counsel. Consistent therewith, defendant's counsel then made a commitment on the record that award would not be made before February 1, 1983.[6]

Decisions on plaintiff's motion for a preliminary injunction, and on defendant's motions to dismiss or for summary judgment, are therefore merged in the following decision on the merits of plaintiff's claim for declaratory and injunctive relief.

### Statement of Facts

On September 3, 1982, the Department of Justice, in the exercise of its contracting function, issued a Request for Proposals (RFP) for the procurement of various automated data processing and litigation support services, to be supplied to the Information Systems Support Group (ISSG) in the Antitrust Division of the Department of Justice. This litigation centers around plaintiff's allegations of conflicts of interest involving personnel of ISSG, specifically the Chairman and certain other members of the Technical Evaluation Board charged with evaluating the proposals, and an officer of Sterling Systems, Inc. (Sterling) who was formerly Chief of ISSG. Sterling has been characterized in the record as the apparently successful offeror in response to this RFP.

ISSG is an independent organization structured within the Antitrust Division which has the greatest need for its automatic data processing and litigation support

1. Order of January 3, 1983.

2. In the order of January 3, 1983, note 1, *supra*.

3. This was subject to plaintiff's request for limited discovery followed by an opportunity to supplement the trial on the merits, if required. Plaintiff's discovery produced a number of additional exhibits which have been received in evidence, without objection. They have in fact been cited by both parties in their post-trial briefs.

4. The transcript consists of 529 pages.

5. They were also directed to advise by January 25, 1983, whether a further trial would be required and they jointly advised on January 24, 1983 in the negative. Proof is therefore considered closed.

6. *See* order of January 14, 1983, published in 1 Cl.Ct. 350.

services.[7] It also provides office automation, management information systems and economic analysis support to Antitrust as well as occasional service to other Divisions of the Department. ISSG is made up of functional units, including the Litigation Services Unit (LSU) and the Data Processing Unit (DPU). Case managers within the LSU support specific antitrust litigation, and provide liaison between attorneys, economists and managers.

Plaintiff provides these types of services to a number of Government and commercial clients and has been a principal provider of such services to ISSG continually since 1978 when it was awarded its first in a series of competitive fixed-price contracts[8] for automated data processing support in specific cases, software development, systems analysis, data base maintenance, software support and use maintenance, data base design, programming support, and related miscellaneous services. Plaintiff's performance has been regarded by ISSG as entirely satisfactory.[9]

The conflicts of interest involving ISSG and Sterling personnel, as alleged by plaintiff, are quite extensive and are therefore spelled out in general, and then in more specific detail. Robert Lawrence Stevens is currently Sterling's Vice-President, Legal Information Services Division. He directed the preparation of Sterling's proposal to ISSG in response to this RFP. Through December of 1980, he was Chief of ISSG. His successor as Chief of ISSG is Terence A. Sweeney, who has worked for ISSG since 1979, first as a systems analyst, and then as Chief of the Data Processing Unit. He participated in drafting and developing the RFP and was a member of the Technical Evaluation Board (TEB) charged with reviewing and rating the proposals received in response to the RFP. Sweeney's professional association with Stevens began in 1978 when Sweeney worked for the Food and Drug Administration. They had worked closely together at ISSG during the period 1979–80 after Stevens hired Sweeney, who then reported directly to Stevens. They are friends who "worked together very intensely for two years."[10] Following Stevens' departure for Sterling at the end of 1980, Sweeney as his successor at ISSG has worked with Stevens on Sterling's contracts with the Lands Division and the Law Enforcement Assistance Administration within the Department of Justice, at the request of and for the benefit of those agencies.

Carl E. Anderson is currently Chief of the Data Processing Unit in ISSG, where he previously served as a systems analyst. He participated in drafting the Statement of Work for this RFP, and serves as Chairman of the Technical Evaluation Board which reviewed and rated the responsive proposals. His professional association with Stevens began in 1971 when they worked together at Infomatics, then at Tymeshare and then at ISSG.[11] During the period 1975–78 when Stevens worked at the Feder-

---

7. The recently concluded AT & T and IBM litigations are mentioned in the record as examples of the type of services provided.

8. Currently services are provided under sole-source extensions to its last competitive fixed-price contract.

9. "I would say that we are satisfied overall with their performance. * * * In particular, they have worked almost as members of our own staff. * * * They have always contributed willingly of their own time, when there have been times of great inconvenience, when people have inconvenienced themselves, have changed vacation plans, sacrificed personal plans and so forth to accomplish an organizational objective. I rate them very highly for that. On the other hand, it is only fair to say that nobody is perfect. * * * I think that having said that

they [occasional problems] did arise and that they were dealt with in, I think, a professional, competent manner, that overall I am entirely satisfied with CACI's work." Testimony of Chief of ISSG, (Tr. 330–31).

10. Tr. pp. 339, 340. "We were successful in implementing some systems that took a lot of pushing and shoving and we spent a lot of long nights, he at his home on the computer, me at my home on the computer, at two, three, four o'clock in the morning trying to get the bloody system working."

11. Anderson worked indirectly under Stevens at Infomatics, he was hired by and worked directly under Stevens at Tymeshare and ISSG.

al Trade Commission, Anderson was working for General Electric on a contract with the FTC.

Patricia J. Shelton is currently Chief of the Litigation Services Unit at ISSG. She too was a member of the Board which evaluated the proposals submitted in response to this RFP. While Stevens was Chief of ISSG, she worked under him as a case manager and after his departure, became Chief of the LSU.[12]

Durwin Smith is currently a member of the Data Processing Unit at ISSG. He too was a member of the Technical Evaluation Board which reviewed the proposals submitted in response to this RFP. He has had a social relationship with Stevens,[13] as have Anderson, Sweeney and Shelton.

The contracting officer for the Department of Justice is Ronald L. Endicott. He was directly involved in preparing and issuing this RFP, in evaluating initial proposals[14], in planning and conducting negotiations with offerors, in evaluating best and final offers, and in selecting the successful offeror. In addition he selected and named the Chair and members of the Technical Evaluation Board earlier described. He has been directly involved with the response to this complaint for declaratory and injunctive relief. In discharging the above responsibilities, he has worked with members of the Technical Evaluation Board, particularly its Chair, Anderson, and the Chief of ISSG, Sweeney. There is no evidence of any prior professional or social relationship between him and Stevens.

A Mr. Kenneth Donald Suits, currently an employee of Sterling, formerly worked for plaintiff over a period of 3 years on its ISSG contracts. Immediately prior to the submission of Sterling's proposal in response to this RFP, he sought to recruit one of plaintiff's employees (Toth), and the employee of another company (Scalzone), for Sterling. Each offeror was required to list in its proposal the technical personnel with which it expected to perform the contract. Suits' recruiting efforts do not evidence a conflict of interest between current and former ISSG employees, and Sterling.

To summarize at this point, Stevens, a Vice-President of Sterling and the immediately prior Chief of ISSG, had a professional and personal relationship in some degree with each of four of the five members of the Technical Evaluation Board reviewing the proposals, and was responsible for employing two of them, the Chairman of that Board and the Chief of ISSG who succeeded him.[15]

Independently of the foregoing, Stevens had from a time prior to his departure from ISSG, to a time prior to the issuance of this RFP, discussed with Anderson the possibility of their working together at Sterling.[16] Two of plaintiff's employees confirmed that Anderson had advised them he had been offered a job by Stevens and would be leaving in a few months.[17] There is some evidence of a lesser effort by Stevens to recruit Patricia Shelton (a member of the

12. "I know Mr. Stevens professionally. I know him socially, but as a—I wouldn't describe us as close friends. I wouldn't describe us as close friends. He is an acquaintance. * * * He is a poker buddy." Tr. 432.

13. Tr. 504–05.

14. As will later appear, in the negotiations preceding award of this proposed cost-plus-fixed fee contract, proposals were invited in two steps, "preliminary," and then "best and final."

15. A longtime employee of ISSG testified and explained why he had described the circumstances to an on-site employee of plaintiff as "suspicious" because "[t]hey owe their jobs" to Stevens. Tr. 452–54.

16. It will be recalled that their careers had run parallel at three different places of employment for the preceding 10 years. In this connection, Anderson testified on direct:

"Q: When you had the last discussion, at that time did you contemplate there being any further discussions?
"A: I would say I would contemplate that there would be further discussions. We left it sort of hanging. He indicated that he had hoped to have positions available in the future, but right now he had nothing he could offer me, and I sort of anticipated some future contact from Mr. Stevens." Tr. 402.

17. Tr. 93, 106–07, 129, 136–38.

Technical Evaluation Board) for work at Sterling.[18]

Another Sterling employee, the aforementioned Suits, has attended social gatherings at Shelton's home, when Anderson was present, and Suits has given parties which Anderson has attended, including one during the period following the issuance of this RFP.[19]

In addition, plaintiff's employees working on site at ISSG, and ISSG employees placed Stevens there and in contact with members of the Technical Evaluation Board on a number of occasions following the issuance of the RFP. There were also telephone contacts during that period.[20] These contacts could be attributable to Sterling contracts with the Lands Division and with the LEAA in the Department of Justice. One contact in particular is highlighted by plaintiff. On December 22, 1982, the day after a bid protest had been lodged with the GAO, Stevens and Sweeney, although aware of the formal protest, met with Stevens in Sweeney's office "to discuss and perhaps formulate transition plans" for transfer of the work to Sterling.[21] The contract had not been awarded on that date, nor has an award been made to this day.[22]

There is no evidence that the officials of plaintiff who prepared its proposal had any special relationships with any member of the Technical Evaluation Board, nor that plaintiff has offered employment to any employee at ISSG.

Plaintiff offers visible examples of how these relationships and contacts could have influenced the procurement procedures adopted in this instance so as to favor Sterling as the apparent successful offeror. While Stevens was Chief of ISSG and before he went to work for Sterling, ISSG planned to reprocure the services plaintiff

was performing by competitive bidding in early 1981. Instead, plaintiff's contracts have been extended on a sole-source basis since a time prior to Stevens' departure. Sweeney became Chief of ISSG in April 1981 and consulted Anderson, among others, regarding the form of the RFP. Anderson was assigned the job of drafting the "Statement of Work" to be performed. This was during the same time period when Stevens was talking to Anderson and Shelton about the possibility of coming to work for Sterling.

After the matter was turned over to Endicott, the contracting officer, in August of 1982, he determined to use a cost-plus-fixed-fee type of contract, after consulting with Sweeney and possibly others. Because "price" has been an important factor in determining that Sterling is the apparently successful offeror, the "Determination and Findings" of the contracting officer as a basis for selecting a cost-plus type of contract are of interest. He found and determined as follows:

Department of Justice

Determination and Findings

Authority to use a Cost-Plus-Fixed-Fee Contract

Upon the basis of the following findings and determinations which I hereby make pursuant to the authority of 41 U.S.C. § 254(b) of the Federal Procurement Regulations, the proposed contract described below may be entered into on a Cost-Plus-Fixed-Fee basis:

Findings

The Justice Department proposes to enter into a contract to acquire 'Baseline' commercial ADP support services. No relia-

---

**18.** Tr. 433–34, 438, 466, 488.

**19.** Tr. 131, 149, 399–400, 430–31.

**20.** Tr. 91, 96, 142, 341–42, 374, 404–06, 474, 484, 495–97. It was the testimony of an ISSG employee that Stevens was "quite a constant visitor." Tr. 452–55.

**21.** Tr. 374–75, 422, 497.

**22.** When asked: "Are you aware that discussions with an offeror at this stage are against regulations?", Sweeney testified: "This meeting was cleared and I asked prior approval to have the meeting with the contracting officer. So far as I was concerned the meeting was authorized." Tr. 375.

ble performance specifications exist. The precise method of accomplishing the work cannot be established in advance, and is subject to improvisation and change during contract performance. The nature and magnitude of the various significant cost elements will depend upon factors developed during performance. As to the essential features of performance, the most that can be fairly bargained for is the Contractor's best effort. Control over incurrence of cost within a significant range of performance cannot be estimated within a range of values sufficiently exact to permit establishment of a reliable, firm price, or of an acceptable target price, or of a realistic cost ceiling.

### Determination

Based upon the foregoing findings, I hereby determine that it is impracticable to obtain the kind or quality of professional services required without the use of a cost-plus-fixed-fee contract type.

**23.** Tr. 314–15, 109–12, 299–314, 355–57, 23. It is noteworthy that in extending plaintiff's contracts on a sole source basis, while awaiting the development of the present RFP, defendant prepared the following "Sole Source Justification":

"The Antitrust Division is now in the process of recompeting its litigation support requirements. For the past three years, the data processing requirements have been performed under contract by CACI, Inc.—Federal. The litigation support systems developed and maintained by CACI consist of specialized software and operational procedures created to organize and process litigation related materials. These systems include:
"* Document Processing System
* Witness Management System
* Exhibit Tracking System
* Transcript/Deposition Processing System
* Data Element Dictionary
"These systems are essential to the Information System Support Group's (ISSG) effective operation and timely responses as demanded by the Division's attorneys. Since the attorneys needs are unique among information retrieval applications, maintenance and enhancement of these systems requires personnel with special knowledge and abilities.
"The knowledge and experience CACI has with ISSG operations makes this contractor uniquely qualified to assist ISSG in its support of the Antitrust Division.

This contract type is likely to be less costly than acquisition by any other menthod. [sic]

| /s/ Ronald L. Endicott | 1 Sep 1982 |
| --- | --- |
| Ronald L. Endicott | Date |
| Contracting Officer | |

The RFP which he issued on September 3, 1982 required proposals to be submitted by October 4, 1982. The litigation support services required were described as: "production control; data entry and reproduction equipment operation; data base design and programming support; and miscellaneous support services." These services were well within the capability of plaintiff and other firms, and were not substantially different in kind from those which plaintiff and others had been furnishing for some time.[23]

The RFP cited four weighted factors by which proposals would be evaluated:

Qualification of technical
personnel — 50 points

"1. CACI has an impressive corporate capability in systems analysis and data base design. For three years CACI has developed systems and solved problems for a wide range of litigation matters.
"2. CACI is completely familiar with the ISSG computing environment including the Justice Data Center and VM/CMS. CACI has also developed or enhanced our specialized software including the raw data pre-processor, the transcript processing system, the generalized data base update production system and several specialized production systems.
"3. CACI is currently supporting a number of matters and projects and could continue this support uninterrupted. This work includes the IBM and AT & T trial support systems, the appellate docket data entry system, the bank tracking system (BATS), the pagination and footnoting system, and the travel voucher system.
"4. Through close interaction with ISSG managers, CACI has developed an in-depth knowledge of our functions and procedures and has demonstrated the ability to communicate with case managers and attorneys to translate their litigation requirements into detailed data processing specifications."
The findings therein appear to be at odds with the findings justifying use of a cost-plus type of contract for this procurement, as quoted in the text, *supra.*

| Price | – 30 points |
|---|---|
| Prior corporate experience | – 10 points |
| Technical approach | – 10 points |

Proposals were to be submitted in two separate parts entitled "Technical Proposal" and "Business Management Proposal" (Price) so that they could be separately evaluated. The contracting officer reserved the right to accept an initial offer, or to request a "best and final offer." Endicott submitted the initial "technical" proposals which he had received to the Technical Evaluation Board chaired as previously described, by Anderson, and consisting of Sweeney, Shelton, Smith and one Thomas Powers, an employee of the Justice Department's Management Division. Powers was the only member of the board without a prior professional or social relationship with Stevens of Sterling Systems, Inc.

Eight proposals had been received including one from plaintiff and one from Sterling. The Sterling proposal showed another bidder, Infodata, as its subcontractor. Infodata's separate bid as a prime contractor showed Sterling as its subcontractor. An officer of Infodata testified that this was in accordance with an agreement between the parties, in which each also agreed not to submit a "stand-alone" proposal, that is one which did not list the other as a subcontractor.[24] The use of a "teaming" (subcontractor) arrangement enhances the technical proposal by combining the technical talent of two firms. However, it tends to detract from the "price" proposal because the overhead and profit of the prime contractor must be layered on top of those of the subcontractor.

Based on a 100-point scoring system utilized by the Technical Evaluation Board, plaintiff at 85.21 was ranked first, and Sterling at 79, was ranked second. Thereafter, Endicott who had retained the "cost" proposals for his own evaluation, enlisted the aid of Anderson, Chairman of the Technical Evaluation Board, in evaluating costs. This provided Anderson with the details of all initial cost proposals, and he conveyed some of these cost figures and rankings to Sweeney.[25]

After the technical and cost evaluations of initial proposals, Endicott and Anderson developed an agenda for further negotiation with each offeror "in the competitive range." The agenda indicated that they intended to confine further negotiations to areas they had identified as susceptible to improvement. Plaintiff's representatives were distressed at their treatment at their negotiating session.[26] Plaintiff was denied an opportunity to make a presentation explaining the proposal which it had prepared. In several areas of the technical proposal, it had hoped to further increase its technical score. Endicott's explanation for limiting the negotiation session to an hour on November 9–10, 1982, was because of his desire to speed up an award.[27]

Plaintiff also cites the refusal of ISSG to evaluate and weigh in "phase-in and phase-out" costs as an award criterion. However, the costs of phasing in a new contractor, and phasing out an existing contractor would be present in any case where it is proposed to award to a new contractor.

24. As it will later appear, the Infodata witness testified that this agreement was breached by Sterling when it later submitted two proposals in response to a request for "best and final" offers, one of them on a "stand-alone" basis.

25. Plaintiff suggests that there was no need for members of the Technical Evaluation Board to know cost figures at this stage of the negotiation, and prior to their evaluation of the "best and final" technical proposals later submitted. Sweeney's interest in this information was explained as follows: " * * * I recall knowing the relative scores, the cost proposals having been converted to points. I recall approximately where they fell. I was more interested in who's on first and how are things shaping up? And how good a competition do we have, how close was it." Tr. 327.

26. "Quite truthfully, in the 12 years I've been in this business, that's the rudest that I would say I have ever been treated in a professional manner. I just had the feeling that the decision was really made at that point in time anyway, that there was very little we could do to improve our proposal." Tr. 25–6. *Also* Tr. 50–53, 174–75.

27. At the trial on January 10–11, 1983, he testified that he had 2–3 weeks of work before he could make an award.

ISSG proposes to phase out existing contractors by sole-source extensions to complete their present assignments, and this appears to be a reasonable solution to the phase-in, phase-out problem.

Following these brief negotiation sessions addressed to the preliminary offers, ISSG exercised its option to request "best and final" offers, to be submitted on November 22, 1982. As he had with the preliminary proposals, Endicott separated cost and technical proposals and again referred the latter to the Technical Evaluation Board.

Sterling was permitted to submit and did submit two different best and final offers, both responsive to this RFP.[28] No other bidder submitted more than one proposal, nor could one gather from the RFP that such a practice was permissible. One of Sterling's best and final offers included Infodata as a subcontractor, the other was a "stand-alone" proposal.[29]

Plaintiff suggests that these circumstances yield an inference of improper communications between ISSG personnel, and Stevens, since Stevens testified that he was aware when he submitted his preliminary proposal that a "teamed" proposal would likely be at a cost disadvantage. It was not until after the negotiating session with Sweeney and Anderson that a stand-alone proposal was also submitted. Anderson, and to a lesser extent Sweeney, were aware of the cost proposals of other offerors prior to that time.[30] More importantly, permitting two parallel entries in the competition from one offeror, would certainly increase the odds in favor of that offeror.

After the Technical Evaluation Board reviewed the best and final offers, they formally reported to Endicott on December 16, 1982. Their report shows that Shelton, Anderson, and Smith, whose professional and social relationship with Stevens has been earlier described, had increased Sterling's "stand-alone" technical score by large amounts, namely, 7, 10, and 8 points respectively.[31] Powers, the only member of the Board with no prior relationship to Stevens, had lowered Sterling's technical score by 3 points.

The same pattern appears with respect to the evaluation of Sterling's "teamed" (Infodata as subcontractor) proposal. Shelton, Anderson, Smith and Sweeney had increased Sterling's score by 6, 7, 11, and 4 points respectively. Powers left that score unchanged. No other offeror enjoyed such dramatic success on the second go-round.

Endicott, with Anderson's assistance, then completed evaluation of the best and final cost proposals, technical and cost scores were computed, and the offerors received their final ranking. It was determined that Sterling's was the apparently successful offer.[32]

It should be noted at this point that "cost" is a very inexact factor in evaluating the ultimate cost of a procurement of this type, to be performed on a cost-plus-fixed-fee contract form.[33] When evaluating proposals, it must be remembered that labor hour estimates are speculative, and that the offerors submit estimated costs. The estimates in the RFP bear little relationship to the actual workload which subsequently de-

**28.** The second proposal was not an *alternate* proposal permitted by the RFP "in addition to a primary proposal directly responsive to this requirement." It was rather a second entry in the same competition.

**29.** *See* note 24, *supra,* and text at that point. *See also* Tr. 219, 411, 471–72.

**30.** Tr. 472–74. Infodata, subcontractor on Sterling's prime bid, did not submit a stand-alone best and final offer, on the second go-round, but rather retained Sterling as its subcontractor, although it was certainly aware, generally, of the same cost disadvantages in a teamed proposal. Since Sterling's stand-alone

proposal was in breach of its agreement with Infodata (note 24, *supra* ), plaintiff suggests that "Stevens knew something which Infodata did not know."

**31.** Sweeney had increased Sterling's stand-alone score by a more modest 3 points.

**32.** Tr. 193–94, 205, 394–95.

**33.** *See* quote of Endicott's "Determination and Findings" earlier in the text to support selection of a cost-reimbursable contract for precisely that reason.

velops. This type of work is subject to "great fluctuations" and the need for certain services is unpredictable. The number of hours required to perform a particular service will vary with the skill and efficiency of a particular contractor's personnel, and is therefore unpredictable. The ultimate "cost" of the contract is therefore unknown, and it will depend in part on an unknown future workload. Actual and properly reimburseable costs will be paid to the successful offeror even if they differ from estimated costs, and a purportedly lower cost proposal could eventually not be the low proposal when measured against actual performance costs. Cost proposals in some instances would include personnel not yet employed and planned to be recruited from a competitor's staff under competitive conditions.[34]

These circumstances led Endicott to conclude in his earlier-quoted "Determination and Findings" in support of a CPFF contract form, that "the most that can be fairly bargained for is the Contractor's best effort." That is what establishes the technical proposals as overwhelmingly important since a contractor's "best effort" is directly dependent on its technical proposal. Both plaintiff's preliminary and best and final technical proposals were ranked highest.[35] Yet Sterling was able to overcome plaintiff's superior technical capability by the weight accorded to its inexact and illusory "cost" proposal.[36] As indicated earlier,[37] there was no need for two members of the Technical Evaluation Board to know the preliminary cost proposals of the competing offerors. This information, if it became known to others, would be very useful to competing bidders in overcoming the lead which plaintiff had in its technical proposal.[38] Moreover, plaintiff saw little opportunity to vary its "cost" proposal between

preliminary and best and final offers because of the requirements of the RFP, and because of its prior actual cost experience in performing this type of work for the past 3 years.[39]

Viewing the whole picture, plaintiff points out that the timing of the RFP, the scope of work described therein, the nature and relative weights of the evaluation and award criteria and the selection of a cost-plus contract form, were all factors which favored Sterling. They were, moreover, factors developed by Anderson and Sweeney, or by Endicott with their assistance and advice. The delay between the time this RFP was first needed and considered, and the time it was actually issued enabled Sterling to develop its corporate ability in litigation support services, and to better meet the criteria of the RFP.

Most of the work contemplated by the RFP had previously been performed by three or four contractors, but all the so-called "baseline" services were now to be performed by a single contractor. The flexibility inherent in cost and price evaluation, as previously outlined, permitted Sterling to become the apparently successful offeror although it did not submit the best technical proposal. And the use of a cost-plus contract form permitted the submission of an understated cost proposal.

Focusing specifically on Stevens, plaintiff points out that he sought to recruit an employee of plaintiff and one of Infodata's employees just prior to the submission of preliminary proposals on October 4, 1982, and used their names in a confidential letter to the contracting officer on October 4, 1982, without their permission. After this lawsuit was underway January 5, 1983, Stevens contacted another of plaintiff's em-

---

**34.** Tr. 264–66, 268, 269–70, 272–73, 314, 318, 366–67, 368–69, 371–72.

**35.** The best and final ranking was first by a lesser margin because of the dramatic increase in Sterling's technical score, as earlier described.

**36.** Tr. 190–94, 394–95.

**37.** Note 25, *supra*.

**38.** As explained by plaintiff's Senior Vice-President, Dr. Moore.

**39.** Tr. 32–34.

ployees in an effort to recruit her just prior to her appearance as a witness in the case.[40]

Before filing this action, plaintiff protested to the contracting officer and to the GAO, but after learning of these protests, Sweeney and Anderson nevertheless met with Stevens on December 22, 1982 to discuss transition plans with Sterling, as "the apparent successful offeror."

The contracting officer, Endicott, did undertake an investigation of plaintiff's charges of conflict of interest. It consisted of an evaluation of the score sheets, of some GAO decisions, and of a letter from the Antitrust Division to Sterling dated November 23, 1981 expressing an opinion on the eligibility of Mr. Stevens as a former ISSG employee to participate in these matters. His investigation did not include a consultation with the agency ethics official, nor an examination of statutes and regulations governing conflicts of interest. He was not present at the above-mentioned meeting of December 22, 1982 between Sweeney, Anderson and Stevens where they discussed "transition plans."

On December 28, 1982, Sweeney called a representative of plaintiff to discuss this protest. While admitting that Stevens had made an offer of employment to Anderson, Sweeney expressed the opinion that it had occurred "years" earlier,[41] and that to not consider Sterling's bid would be denying Stevens the right "to earn a living." Plaintiff's representative met with the contracting officer on December 29, 1982 and he agreed to arrange a meeting with the Director of Contracts for the agency. Thereafter the meeting was refused on advice of counsel.

### Discussion

The decision in *Scanwell Laboratories, Inc. v. Shaffer*,[42] established that a bidder

denied a Government contract because of alleged illegal action by a Government agency in letting the contract to another unresponsive bidder, has standing to challenge the validity of the agency action. Effective October 1, 1982, the Federal Courts Improvement Act[43] amended 28 U.S.C. § 1491 to vest this court with the following additional jurisdiction:

(a)(3) To afford complete relief on any contract claim brought before the contract is awarded, the court shall have exclusive jurisdiction to grant declaratory judgments and such equitable and extraordinary relief as it deems proper, including but not limited to injunctive relief.

Significant for our purposes is the legislative history underlying this amendment, and specifically a reference to "the Scanwell doctrine." The Senate Report[44] reads:

By conferring jurisdiction upon the Claims Court to award injunctive relief in the pre-award stage of the procurement process, the Committee does not intend to alter the current state of the substantive law in this area. Specifically, the Scanwell doctrine as enunciated by the D.C. Court of Appeals in 1970 is left intact. *See Scanwell Laboratories, Inc. v. Shaffer*, 424 F.2d 859 (D.C.Cir.1970). Moreover, the Committee expects that the court will utilize the authority conferred upon it by this section only in circumstances where the contract, if awarded, would be the result of arbitrary or capricious action by the contracting officials, to deny qualified firms the opportunity to compete fairly for the procurement award.[45]

The decisions following *Scanwell* demonstrate that while standing to challenge agency action in these circumstances is established, plaintiff nevertheless bears a

40. Tr. 508–10.

41. The record shows that it was quite recent.

42. 424 F.2d 859 (D.C.Cir.1970).

43. Pub.L. 97–164, 96 Stat. 25.

44. S.Rep. No. 97–275, 97th Cong. 1st Sess., p. 23 U.S.Code Cong. & Admin.News 1982, pp. 11, 33.

45. Further indications that the *Scanwell* doctrine is regarded as "alive and well" by the Congress, are contained in the House Report, H.Rep. No. 97–312, 97th Cong. 1st Sess., p. 43.

heavy burden if the challenge is to be sustained. *Steinthal & Co., Inc. v. Seamans*[46] held that a court should not overturn a decision with respect to award unless the aggrieved bidder demonstrates that there was no reasonable basis for the agency's decision. That case, however, involved nothing more than a desire to readvertise an Invitation for Bids which procurement officials had found to be ambiguous.[47] *Kentron Hawaii v. Warner*[48] reiterates the rational basis test in *Steinthal,* and adds that a proposed procurement can also be set aside if it involves a clear and prejudicial violation of applicable statutes or regulations.

Plaintiff urges that the proposed award to Sterling in this case fails to meet either of the tests enunciated in the cited cases.[49] Those cases involved facts characterized in the respective opinions as involving the exercise of discretion, or as trivial or harmless violations of the regulations. The same cannot be said of the facts gleaned from the record in this case, as detailed above. As stated by the court in *Steinthal:*[50]

> We do not recede from our expression in *Scanwell* of the beneficial purposes served by frustrated bidders who as "private attorney generals" can aid in furthering the public interest in the integrity of the procurement process. The courts are properly concerned that the procurement activities of the Government be carried out in accordance with the

applicable statutes and agency regulations and that these governmental functions not be permitted to deteriorate into actions reflecting personal predilections of administrative officials, whether ascribed to whim, misplaced zeal, or impermissible influence.

Plaintiff's protest herein is based on serious allegations of conflict of interest cited to the trial record. Our attention is further directed to a number of judicial and statutory authorities which would characterize the proposed award to Sterling as illegal by reason of the relationships, contacts, and actions described in that trial record.

In *United States v. Mississippi Valley Generating Co.,*[51] the U.S. Supreme Court granted certiorari to review a decision of the U.S. Court of Claims—

> "because the conflict-of-interest problem presented by this case has a far-reaching significance in the area of public employment and involves fundamental questions relating to the standards of conduct which should govern those who represent the Government in its business dealings.[52]

In reversing a sizeable judgment in favor of the plaintiff, the Court stated, *inter alia:*

> The obvious purpose of the statute,[53] is to insure honesty in the Government's business dealings by preventing federal agents who have interests adverse to

---

**46.** 455 F.2d 1289, 1298 (D.C.Cir.1971).

**47.** *Id.* at 1298–99. *See also, Wheelabrator Corp. v. Chafee,* 455 F.2d 1306 (D.C.Cir.1971) upholding the discretion of procurement officials to use two-step formal advertising rather than negotiating exclusively with a company alleged to be uniquely qualified; and *Princeton Combustion Research Lab. v. McCarthy,* 674 F.2d 1016 (3rd Cir.1982), involving a harmless violation of the agency's procurement procedures, and furthermore an effort to enjoin performance of a contract which had been underway for 2 months.

**48.** 480 F.2d 1166 (D.C.Cir.1973).

**49.** *See* cases in notes 46–8, *supra.*

**50.** Note 46, *supra,* at 1305.

**51.** 364 U.S. 520, 81 S.Ct. 294, 5 L.Ed.2d 268 (1961).

**52.** The AEC as the Government's contracting agency had cancelled an existing contract for a power plant because the power to be produced by the plant was no longer needed. The Government defended against a suit for damages on several grounds, but primarily on the ground that the contract was unenforceable due to an illegal conflict of interest on the part of an officer of a financial institution which was likely to benefit from the contract, said officer having acted as an unpaid advisor to the Government in the negotiation of the contract.

**53.** 18 U.S.C. § 434, a conflict of interest statute which is a predecessor of 18 U.S.C. §§ 207, 208, cited by plaintiff as directly applicable in this case.

those of the Government from advancing their own interests at the expense of the public welfare. * * * The moral principle upon which the statute is based has its foundation in the Biblical admonition that no man may serve two masters. * * The statute is thus directed not only at dishonor, but also at conduct that tempts dishonor. This broad proscription embodies a recognition of the fact that an impairment of impartial judgment can occur in even the most well-meaning men when their personal economic interests are affected by the business they transact on behalf of the Government. To this extent, therefore, the statute is more concerned with what might have happened in a given situation than with what actually happened. It attempts to prevent honest government agents from succumbing to temptation by making it illegal for them to enter into relationships which are fraught with temptation. * * * The statute is directed at an evil which endangers the very fabric of a democratic society, for a democracy is effective only if the people have faith in those who govern, and that faith is bound to be shattered when high officials and their appointees engage in activities which arouse suspicions of malfeasance and corruption * * *. This protection can be fully accorded only *if contracts which are tainted by a conflict of interest on the part of the Government agent may be disaffirmed by the Government.* * * * Although non-enforcement [of the contract] frequently has the effect of punishing one who has broken the law, *its primary purpose is to guarantee the integrity of the federal contracting process* and to protect the public from the corruption which might lie undetectable beneath the surface of a contract conceived in a tainted transaction. * * * The question is whether the Government may disaffirm a contract which is infected by an illegal conflict of interest. * * *.[54] [Emphasis supplied].

The ethical standards enunciated in *Mississippi Valley* were found to require cancellation of a contract already underway based on the facts present in that case. The issue here then is whether those ethical standards are sufficient to enjoin the formation of a contract which is not yet in being, based on the facts of record in this case. Aside from the "appearance of evil" throughout that record, there are a number of instances in which Stevens' prior service as Chief of ISSG, and his long-standing and continuing professional and social relationships with his successors, and with all but one of the 5-member Technical Evaluation Board ripened into concrete manifestations of prejudice in favor of Stevens' company, and against plaintiff and others.

While at ISSG, Stevens organized the litigation support systems being procured and was largely responsible for staffing the organization. In his job, he became familiar with the pricing strategies of plaintiff and other incumbent contractors and with the people whose resumes could be used to support a technical proposal. After leaving for employment with Sterling, that company obtained contracts from other divisions of the Justice Department. The relationship with his former staff continued, and there were two instances of employment offers conditioned in part on his success in receiving additional contracts. The subject matter of this RFP was contemplated while Stevens was still Chief of ISSG. There was no great rush to advertise for and to award a contract for continuing services. Instead, plaintiff's and other existing contracts were extended by amendment, providing Sterling with an opportunity to gain corporate experience in the type of new contract proposed. As issued, the RFP invited a cost-plus contract, which removes much of the risk for a successful offeror. Costs and price are given an inordinate weight in the overall evaluation of proposals, although actual costs cannot be known in a contract of this type, and cost estimates are inexact and illusory. This permits the final scores to be adjusted, based on alleged "cost savings" which cannot be demonstrated or supported.

---

**54.** 364 U.S. at 548, 49, 50, 62, 63, 64, 65, 66, 81 S.Ct. at 308, 309, 315, 316, 317. *Also see* and

*cf. K & R Engineering Co., Inc. v. United States,* 616 F.2d 469, 222 Ct.Cl. 340 (1980).

In the all-important area of technical proposals, the four out of five members of the Technical Evaluation Board who had a previous professional or social relationship with Stevens, dramatically increased the technical scores of his company on the second go-round. Last but not least, Sterling has been permitted to submit two proposals for the same services, each with certain attributes not found in the other. This provided it with a distinct advantage over other offerors who could not have been made aware by the RFP that such a practice was permissible.[55]

As plaintiff correctly points out, this is not a criminal proceeding, but plaintiff nevertheless cites the two most current and relevant statutory provisions governing conflicts of interest and standards of conduct. Section 207 of Title 18 provides in pertinent part:

> (a) Whoever, *having been* an officer or employee of the executive branch of the United States Government * * * *after his employment has ceased,* knowingly acts as agent for * * * or otherwise represents, any other person * * * in any formal or informal appearance before, or, with the intent to influence, makes any oral or written communication on behalf of any other person * * to—
>
> (1) any department * * * of the United States or any officer or employee thereof, and
>
> (2) in connection with any * * * con-tract * * * *or other particular matter* * * *, in which the United States * * * is a party or has a direct and substantial interest, and
>
> (3) *in which he participated personally and substantially as an officer or employee* through decision, approval, disapproval, recommendation, the rendering of advice, investigation or otherwise, *while so employed;* or
>
> (b) Whoever, (i) having been so employed, *within two years after his em-ployment has ceased,* knowingly acts as agent * * * for, or otherwise represents, any other person * * * in any formal or informal appearance before, or, with the intent to influence, makes any oral or written communication on behalf of any other person * * * to, or
>
> (ii) having been so employed * * * *within two years after his employment has ceased,* knowingly represents or aids, counsels, advises, or assists in representing any other person * * * by personal presence at any formal or informal appearance before—
>
> (1) any department * * * of the United States, and
>
> (2) in connection with any * * * con-tract * * * *or other particular matter* * * * in which the United States * * * is a party or has a direct and substantial interest, and
>
> (3) as to (i), *which was actually pend-ing under his official responsibility as an officer or employee within a period of one year prior to the termination of such responsibility,* or as to (ii), in *which he participated personally and substantially as an officer and employ-ee;* * * * shall be fined not more than $10,000 or imprisoned for not more than two years, or both. [Emphasis supplied].

Defendant argues that this RFP was not the same "contract * * * or other particular matter" as those with which Mr. Stevens was involved as Chief of ISSG. Although somewhat different in form, the proposed contract is essentially a follow-on to the type of continuing automatic data processing and litigation support services procured during Stevens' tenure at ISSG and thereafter. In any event the procurement is part of the same "particular matter."

The defendant further argues that "(t)here is simply nothing wrong with Mr. Stevens' conduct, and it provides no basis to prevent award of the contract won by his

---

**55.** Defendant's brief describes the dual Sterling proposals as "inventive and aggressive bidding". Such "inventiveness" and "aggression" cannot be condoned, however, if the integrity of the bidding process is to be preserved.

employer." But that is a position completely contrary to the one taken by the Department of Justice in a parallel case drawn to our attention by plaintiff.

In *System Automation Corporation v. Department of the Army*,[56] the court denied a motion for a temporary restraining order seeking to stop performance of a contract already being performed by General Research Corp. It was alleged that the contract was "fatally tainted by conflicts of interest violating 18 U.S.C. § 207", *inter alia*, in that one Shinderman, a former Government employee now working for General Research, was guilty of a conflict of interest. Finding that the contract could later be terminated on the authority of *Mississippi Valley*[57] if plaintiff's allegations proved to be correct, the application for a restraining order was denied.

Thereafter Shinderman and the "successful" contractor were indicted by the Department of Justice. The contractor's plea of guilty was accepted, resulting in the initiation of debarment proceedings, subsequently terminated following an agreement by the contractor to return all payments received under the contract. Criminal charges against the remaining defendants were dismissed. In a negotiated plea, Count VI of the Shinderman indictment was admitted. It had framed a violation under 18 U.S.C. § 207(a) in that Shinderman was involved in a so-called "PERDDIMS" matter while a Government employee, and had later negotiated on behalf of the General Research Corp. on the same matter. Shinderman had unsuccessfully attempted to rebut the inference that "the PERDDIMS program that I was involved in (which involvement ended almost three years ago) is the same PERDDIMS program that is at issue here. It is not. The earlier PERDDIMS program was much more limited in scope * * *."

Plaintiff also draws our attention to Section 208 of Title 18 which provides in pertinent part that:

(a) * * * whoever *being an officer or employee* of the executive branch of the United States government * * * participates personally and substantially as a Government officer or employee, through decision, approval, disapproval, recommendation, the rendering of advice, investigation, or otherwise in a * * * *contract* * * * *or other particular* matter in which he has knowledge, he * * * is *negotiating* or has *any arrangement concerning prospective employment* * * * shall be fined not more than $10,000, or imprisoned not more than two years or both. [Emphasis supplied].

Here again the plaintiff cites a parallel case[58] in which the Department of Justice argued on appeal:

* * * Because such cases all fall within the scope of the problem that Congress sought to remedy, Congress must have intended that the term "negotiating" would encompass such preliminary stages of negotiation even if the process had not yet reached the stage of formality envisioned by the District Court.

*    *    *    *    *    *

Moreover, we believe that the *Mississippi Valley* case and the legislative history of Section 208 provide ample support for the conclusion that the term "arrangement" was not intended to be limited to a formal contract of employment having agreed upon the terms and conditions. For example, if the Government official were to agree to go to work for a company some undetermined time in the future after leaving Government service, but the parties do not communicate about the specific terms of employment, the Government official would still have an "arrangement" for prospective employment under the statute. * * * If the statute does not have this broader reach,

---

**56.** Memorandum opinion, U.S. District Court for D.C., November 24, 1980.

**57.** Note 51, *supra*.

**58.** *United States v. Conlon,* 628 F.2d 150 (D.C. Cir.1980), reversing 481 F.Supp. 654 (D.D.C. 1979).

it could be readily circumvented simply by delaying execution of the formal employment contract.

In reversing the District Court's dismissal of the indictment, the Court of Appeals adopted the Department's argument holding that:

The words "negotiating" and "arrangement," as used in this statute, particularize the kinds of "business connections" encompassed by this provision. In light of the legislative history of the provision, we must conclude that Congress meant the words "negotiating" and "arrangement" in § 208(a) to be given a broad reading, rather than the narrow reading accorded by the District Court.[59]

■ Defendant's main arguments in this case are essentially two-fold. It first asserts that there is no evidence whatever of a conflict of interest or other violation or of any improprieties.[60] That argument ignores the entire record in this case, and the ethical standards set forth in *Mississippi Valley*[61] and its progeny. It also ignores the holding in that case that the initiation of criminal or other disciplinary proceedings is not a prerequisite to the relief sought herein. It was the opportunity for a conflict of interest, and for a breach of the standards of conduct applicable to Government personnel, which supported the Supreme Court's cancellation of an existing contract in that case. The record is replete with instances where Stevens and his former associates at ISSG exceeded the bounds of propriety and thus created at least the appearances of and the opportunity for impropriety discussed in *Mississippi Valley*.[62]

■ The second argument submitted by defendant is that plaintiff lacks standing to maintain this action. That is an issue which was put to rest by the *Scanwell* decision.[63] That decision has been cited with approval in the "bid protest" cases which followed[64] and which found "standing to sue," regardless of whether or not they subsequently granted the relief sought. The *Scanwell* doctrine was also cited as currently effective in the legislative history underlying the legislation vesting this court with jurisdiction in bid protest cases.[65] Cases cited by defendant on the "standing" issue bear no resemblance on their facts to bid protest cases such as this.

In summary, the cases in which the courts have expressed a reluctance to interfere in the procurement process[66] have usually involved relatively trivial variations from the procurement regulations. This case presents improprieties of the kind which

---

59. *See also* 5 C.F.R. § 735.201a (1982), setting forth standards of conduct for Government personnel:

. "An employee shall avoid any action, whether or not specifically prohibited by this subpart, which might result in or create the appearance of

(a) Using public office for private gain;

(b) Giving preferential treatment to any person;

(c) Impeding Government efficiency or economy;

(d) Losing complete independence or impartiality;

(e) Making a Government decision outside official channels; or

(f) Affecting adversely the confidence of the public in the integrity of the Government.

60. *See,* for example, text, above, where defendant's brief argues that "[t]here is simply nothing wrong with Mr. Stevens' conduct, and it provides no basis to prevent award of the contract won by his employer."

61. Note 51, *supra.*

62. *See also,* Comptroller General Opinion B–174455, 51 Comp.Gen. 588, where the opinion questions the propriety of permitting certain Government representatives to serve on a pre-award survey team, because their landlord was a competitor in the procurement. (The agency procurement action was reversed on other grounds). *See also,* Comptroller General Decisions B–179582 and 179328, 54 Comp.Gen. 375, where the opinion considered a protest which raised significant issues concerning a procurement agency's partiality toward one contractor (to the prejudice of other competitors for award) who possessed direct access to Government personnel formulating the RFP.

63. Note 42, *supra.*

64. *See* notes 46–48, *supra.*

65. *See* notes 44, 45, *supra.*

66. *See* notes 46–48, *supra.*

were not condoned in *Mississippi Valley*, resulting in cancellation of a partially performed contract in that case. That decision would, *a fortiori*, support an injunction against award of a contract not yet in existence but one which, if awarded, would be tainted for similar reasons. The nexus between *Mississippi Valley* and *Steinthal*,[67] for example, is that there would be no rational nor reasonable basis for awarding a contract to Sterling on the facts of record in this case, and such an award would be, moreover, arbitrary, capricious and an abuse of discretion.[68]

## CONCLUSION

Award of a contract to Sterling in response to the Request for Proposals (RFP) at issue in this case, is hereby permanently enjoined. Plaintiff's motion for a preliminary injunction is dismissed as moot. Defendant's motions to dismiss, or for summary judgment, are denied.

---

**67.** Note 46, *supra*.

**68.** It is not necessary in this proceeding to determine whether such an award would also be illegal.

