HARRIS DATA COMMUNICATIONS,
INC., Plaintiff,

v.

The UNITED STATES, Defendant.

No. 83–83C.

United States Claims Court.

April 6, 1983.

James D. Bachman, Washington, D.C., for plaintiff. Gerard F. Doyle and G. Lindsay Simmons, Cotten, Day & Doyle, Washington, D.C., of counsel.

Lynn Bush Ferguson, Washington, D.C., with whom was Asst. Atty. Gen. J. Paul McGrath, Washington, D.C., for defendant. Mark R. Wiener, Automatic Data Processing Selection Office, Dept. of the Navy, Washington, D.C., of counsel.

## OPINION

NETTESHEIM, Judge.

Plaintiff Harris Data Communications, Inc. ("Harris"), filed its motion for a preliminary injunction on February 18, 1983, accompanied by a complaint for a declaratory judgment that the Automatic Data Processing Selection Office ("ADPSO") of the United States Department of the Navy violated applicable federal procurement regulations by determining that Harris' proposal in response to Request for Proposal No. 66032–82–R–0011 (the "RFP") was unacceptable and by excluding it from further competition. Harris alleged that ADSPO wrongfully failed both to advise Harris of certain deficiencies in its proposal and to allow Harris to revise its proposal before making its determination. A declaratory judgment also was sought that, in excluding Harris' proposal, the contracting officer departed from the evaluation plan under the RFP and exceeded his discretion. In addition, Harris requested declaratory relief reinstating its proposal for the award of the contract under the RFP and requiring consideration of its proposal under the terms of the RFP, as well as a preliminary injunction restraining the ADPSO from taking any further action with respect to award of the contract, including consideration of other proposals, pending Harris' reinstatement.

By telephone conference status call with the court held on February 24, 1983, the parties agreed that defendant would file its opposition on March 8, Harris would reply on March 15, and a hearing would be held on March 23. Defendant moved on March 8 for summary judgment, coupled with its opposition to the request for injunctive relief. On March 9 the court entered its order scheduling the hearing for March 23, 1983, and advising that, after the court had an opportunity to review Harris' response to the summary judgment motion, the par-

ties would be alerted if an evidentiary hearing were required. The hearing on the preliminary injunction was consolidated with trial on the merits on March 17. To complete the record on summary judgment, Harris on March 22, 1983, cross-moved for summary judgment in its favor.

Trial was conducted on March 23, 1983. Each side proffered two witnesses, and eleven exhibits were admitted into evidence, including the original Harris proposal which on March 24 was ordered to be maintained under seal by the Clerk of the Court.

At the conclusion of the March 23 proceedings, Harris was permitted to file a closing brief on March 28 addressing any additional issues developed at trial. When defendant resisted additional briefing, the court invited defendant to rest on the record, but noted that its brief would be accepted if filed by March 31. Both parties submitted timely post-trial briefs. Closing argument was heard on April 1, 1983.

### FACTS

The events preceding exclusion of Harris' proposal from further consideration for award under the RFP are not controverted. However, the justification for excluding the proposal is disputed, and the following recitation of facts includes the court's findings after trial and review of Harris' proposal as to the disputed decision-making process. These findings necessarily stem from credibility determinations. Harris presented James A. Graves, Harris' Branch Manager for Computer Systems Division, and G. Phil Steel, its Director of Federal Marketing. The testimony of these gentlemen was given due weight; each was forthcoming and accommodating to questions by counsel and the court.

Defendant's witnesses were David Francis Orszak, the Contract Specialist in charge of evaluating all proposals received under the RFP and the team leader for conducting negotiations leading to the ultimate contractual award. His supervisor, John J. Koehne, the Contracting Officer, also testified. The testimony of these defense witnesses has been given full weight, because under extensive examination by Harris' counsel, as well as questioning by the court, they provided detailed explanatory evidence of the process by which Harris' proposal was eliminated from further consideration. Based on the demeanor of Messrs. Orszak and Koehne, as well as the content of their testimony, the court finds, as discussed more fully herein, that the decision to exclude Harris was made dispassionately, evenhandedly, reluctantly, and—most important—rationally.

The solicitation document (RFP) entitled Computer Systems for the Pay/Personnel Administrative Support Systems/Source Data Systems ("PASS/SDS") was issued on July 6, 1982. This indefinite-delivery, indefinite-quantity contract called for a source data system ("SDS"), a computer system installed to support the Navy's program of consolidating, modernizing, and improving the provision of pay, personnel, and transportation support to its service members. The program to achieve these goals was designated the Pay/Personnel Administrative Support System ("PASS"). To be acquired via negotiation were computer systems, including hardware, software, maintenance, training, and documentation to implement PASS/SDS at 27 sites, with possible implementation in up to 400 individual locations. Revenues flowing to the successful bidder were projected at $100 million over the ten-year system life, although the contract minimum guarantee was four systems at three locations.

The RFP called for submission of proposals in three volumes, and it is undisputed that Harris on December 13, 1982, timely submitted its proposal.[1] Volume I of Har-

---

1. Also undisputed are the facts that one box was delivered shortly before the 2:00 p.m. deadline for receipt of proposals and that four additional boxes were receipted at 2:05 p.m., after the deadline expired. These were rejected as untimely, as was an additional box delivered to ADPSO on December 28, 1982. Harris does not contend that any of the materials in the late-submitted boxes should have been considered in connection with its proposal. Rath-

ris' proposal contained, as required by the RFP, "Contractual Information." The contents of this volume are not at issue. Volume II, the critical volume entitled "Cost Information," was submitted in one binder. Volume III, Harris' submission on "Technical," consisted of two binders.

The RFP contained instructions for the required submissions on each volume. In pertinent part, the instructions for Volume II provided, "The offeror shall complete applicable exhibits to this solicitation and return these exhibits as Volume II of the proposal." These instructions also contained language, as follows: "These exhibits shall contain any and all cost information and shall be returned in the offeror's proposal. . . . Offerors are required to submit their cost data in the format specified for each exhibit. . . . All cost exhibits shall be submitted as required. All costs shall be submitted as Volume II of the offeror's proposal." There followed detailed instructions for each of the 15 alphabetically designated cost exhibits.

Section M of the RFP, Evaluation Factors for Award, ¶ 2, "Fixed Prices," provided in ¶ 2.1.c. in full:

1. Fixed Prices. To be considered acceptable under the solicitation, offerors shall offer (i) fixed prices for the initial contract period for the initial system or items being procured, (ii) fixed prices or prices that can be finitely determined for each separate option renewal period, and (iii) fixed prices or prices that can be finitely determined for all required option quantities.

2. Evaluation of Prices. Offers will be evaluated for purposes of award by adding the total price of all optional periods and all stated optional quantities to the total price for the initial contract period covering the initial system or items. These prices will be adjusted by the appropriate discount factors shown in Exhibit Q of the solicitation document. Evaluation of option prices will not obli-

gate the Government to exercise these options. *Offers that do not include fixed or determinable system (items) life prices cannot be evaluated for the total system life requirements and will be rejected. Offers that meet the mandatory requirements will be evaluated on the basis of the lowest overall cost to the Government, price and other factors considered.*

(Emphasis added.)

The catalyst for this lawsuit is the language of section M ¶ 1, "Source Selection." The parties agree that the RFP was tailored to this procurement and that this provision was customized and is unique to the RFP:

All proposals shall be prepared in accordance with the instructions given in Section L. Proposals will be validated and evaluated on technical and contractual acceptability and lowest overall contract life cost. *The technical sections of the proposals will be evaluated against the mandatory Government requirements set forth in Section C, Descriptions/Specifications. Proposals that do not conform to the requirements or those that propose exceptions to the requirements will be brought to the offeror's attention. Revised proposals which are not acceptable will not be further considered and the offeror will be notified of the unacceptability.* An Operational Capability and Benchmark Demonstration will be required for all offerors whose proposals are acceptable. The cost sections of the proposals will be evaluated to determine overall contract life cost to the Government. This includes not only offeror related costs (equipment and support), but also predictable in-house Government expenses for ADPE [automatic data processing equipment] installation, operation, and support over the system life (communication costs will be included in this category). The selected offeror will be recommended to the Department of

er, Harris urges further consideration of the three volumes contained in its timely submitted proposal.

Navy Senior ADP Policy Official for award of a contract.

(Emphasis added.)

By letter of January 5, 1983, signed by Contracting Officer Koehne, Harris was advised that "several key items were missing; e.g., a. No maintenance prices for most sites[;] b. Software prices were missing for several sites [; and] c. Prices required for exhibits C to R were missing."

The letter continued, "In addition, in your statement of understanding you indicated the prices were valid only for twelve months and thereafter to be based on then current Harris GSA Equipment Schedule. This does not satisfy the price requirement." The Contracting Officer concluded, "The missing prices and no fixed or determinable pricing after Month 12 precludes [sic] acceptance of your offer as complete."

Harris asked for reconsideration by letter dated January 7, 1983, and a meeting took place on January 12, with representatives of Harris and Messrs. Koehne and Orszak attending, at which Harris was presented with a letter of that date signed by the Contracting Officer stating:

[T]he following major omissions ... are representative of the incomplete offer:

a. Hardware configuration pricing is missing from several installation sites. No principal period of maintenance pricing is provided for most sites.

b. Software prices are missing for several sites[.]

c. Prices for the following remaining price exhibits are missing and there is no ability to reconstruct what the prices should have been:

(1) extended maintenance service rates

(2) per call maintenance service rates

(3) training costs (initial and follow-on)

(4) documentation costs

(5) pre-installation test time costs

(6) support personnel costs

(7) miscellaneous item costs

(8) government costs estimates as defined in exhibit L, M, N, and O, and,

(9) life cycle cost tables defined in exhibits Q and R[.]

d. No "Representations, Certifications and other Statements of Offeror," specified in Section K of the solicitation was provided.

e. There is a lack of technical documentation to support compliance with the technical requirements.

Contracting Officer Koehne reiterated his earlier decision, as follows: "The Navy must conclude that the sum total of the numerous omissions precludes an intelligent evaluation of your proposal and it cannot be given further consideration."

On January 18, 1983, Harris initiated a bid protest to the United States General Accounting Office ("GAO"). GAO's advisory opinion has not been rendered. The parties did not request that the court call on GAO to expedite its decision, and the advisory opinion has not been received as of the date of this decision.[2]

2. One issue subsumed in these proceedings was Harris' request to ADPSO for an accurate magnetic tape which would enable Harris to participate in the benchmark (a test of offerors' computer technical capabilities based on comparative responses to problems). According to Contract Specialist Orszak, an informal benchmark was conducted on February 11, 1983, and the formal benchmark is scheduled for late May or early June, 1983. Harris seeks to be provided with the corrected tape and to be given an opportunity to participate in the formal benchmark. According to Mr. Graves, once the corrected tape was received, six weeks would be required in order to submit a plan for the benchmark and an additional four months to program the computer for the benchmark. Transcript, Mar. 23, 1983, at 40–41 (hereinafter "Tr."). Harris' exclusion from the benchmark by virtue of ADPSO's January 12 final decision, of course, excluded it from competition in the benchmark. Because the court upholds the decision not to consider Harris' proposal after January 12, the court will not address further the factual history of the original issuance of the tape, the requests for an accurate tape, the feasibility of Harris' developing its own tape based on the printout furnished by ADPSO, and the negotiations (including submissions of revised cost proposals), which customarily ensue after completion of the benchmark. However, the court gives full consideration to Harris' argument, in the context of the impact of that practice on the omissions in Harris' cost proposal, that price revisions, in fact, do occur after a benchmark. In that regard, the Navy published on September 25, 1982, certain "Questions and Answers,"

Witness Graves, who was in charge of preparing Harris' proposal over an intensive two- to three-month period, testified that the proposal was "complete although imperfect."[3] Mr. Graves, however, could not testify as to whether the ADPSO's January 5 and 12 letters correctly reflected missing price information and exhibits.[4] Prior to trial he had not conducted a review of Harris' copy of the proposal, which he was unable to verify as accurate, because it was not an exact duplicate of what had been delivered to the Navy.[5] At the conclusion of trial, ADPSO's copy was admitted as a plaintiff's exhibit to be filed under seal and on March 24 was examined by counsel for the parties, as well as Messrs. Graves and Orszak, to allow Harris to verify the exact contents of its submission.

The court has reviewed Volume II of Harris' proposal and finds that the January 12 letter correctly noted that, of the 15 exhibits required, no exhibit was completed and 13 were omitted entirely:

A—Hardware Configuration Cost Table (partial omission)

B—Software Cost Table (partial omission)

C—Extended Response Maintenance Service Rates

D—Training Cost Tables

E—Documentation Cost Table

F—Pre-Installation Test Time Cost Table

G—Contractor Support Personnel Cost Table

J—Miscellaneous Item Costs

K—Discounts

L—Telecommunications Circuits Cost Table

M—Power and Cooling Requirements Table

N—Site Preparation Cost Table

O—Evaluated Optional Features

Q—Contract Life Cost Summary Table

R—Final Totals Table[6]

Each of these exhibits was to be completed as to the 27 sites, except exhibits F, G, and K. Some exhibits, *e.g.*, Exhibit A, required pricing at each of the 400 locations.[7] Exhibit R called for a summary of total costs for each of the 27 installation sites by program month for the 120 months of the system life.

Witnesses Graves and Steel explained that they understood that the quoted language of section M ¶ 1 of the evaluation factors allowed Harris an opportunity to revise any deficiency in its proposal.[8] Mr. Graves testified that only minor corrections or revisions were required to make Harris' proposal complete.[9] According to Mr. Graves, these could be accomplished within one week,[10] whereas Mr. Steel said that "a couple of days" would suffice.[11] Both witnesses stated that maintenance and software prices could be determined from the GSA Schedule Contract Price List, submitted with part 9 of Volume III, "Technical," adding one sentence in Volume II,

which included as number 10: "Subject: Changes to proposals[;] . . . Question: Between initial proposals and best and finals, may offerors change their proposals?[;] Response: Improvements to an otherwise 'acceptable' or 'capable of being made acceptable' proposal will be considered, time permitting. Changes would require a re-run of the benchmark."

3. Tr. at 42.

4. Tr. at 51–56; *see id.* at 44, 59.

5. Tr. at 54.

6. The exhibits were designated sequentially; however, some letters were reserved (H, I, P).

7. Mr. Koehne testified that because few proposals were submitted, he would not have held Harris to submitting the price information in the form required by the exhibits if the information had otherwise been available. Tr. at 257–58.

I would reach out, and use my own discretion to be darn sure that we used anything that was available to us, if we had rationale and logic to support the construction, and that they supported and verified that that conclusion was what they meant to be put into the price block.

THE COURT: And you do not believe that that could have been done in the case of Harris' proposal?

THE WITNESS: No way.

Tr. at 258.

8. Graves: Tr. at 31; Steel: Tr. at 230.

9. Tr. at 34.

10. Tr. at 64.

11. Tr. at 248.

"Cost Information," to the effect that the GSA prices applied to Volume II [12] and also adding an economic price adjustment for the years after FY 1984.[13] However, the terms and conditions of the GSA schedule were not the same as the RFP; GSA prices were not good beyond the current fiscal year; and the cost information customized training could not be derived from the GSA schedule.[14]

Contract Specialist Orszak performed the review of Harris' proposal incident to its exclusion. Stating that he was "instrumental" in drafting section M ¶ 1, Mr. Orszak construed it as providing that only technical proposals that failed to conform to mandatory requirements or that proposed exceptions thereto would be brought to an offeror's attention. The language Harris relied upon did not apply, Mr. Orszak testified, to cost sections of proposals.[15]

Initially, as with all proposals,[16] Mr. Orszak inventoried Volume II "Cost Information," and found 326 pages submitted as responsive to Exhibits A and B.[17] He notified Mr. Koehne, who verified the omissions,[18] and the January 5, 1983 letter to Harris was issued. Mr. Orszak explained that his evaluation of Harris' cost information was not based on price, but on the completeness of the data submitted.[19] A general overview of the completeness of the Volume III, "Technical," data was also made.[20] According to Mr. Orszak, a proposal could be considered unacceptable on technical grounds depending on the degree of technical omissions.[21] Manifestly, technical omissions to some degree are tolerated, as are cost omissions.[22] Harris' proposal was not evaluated with respect to the technical acceptability of the Volume III submission.[23] Mr. Orszak deemed Harris' cost omissions significant because, even if the GSA schedule had been mentioned, ADPSO could not reconstruct many of the items that were required to be costed which were not incorporated in the GSA schedule [24] and no fixed prices were given and could not be derived based on Harris' statement that after FY 1984 prices would be based on the then-current Harris-GSA schedule.[25]

---

**12.** Graves: Tr. at 34–35, 41, 45, 47, 72; Steel: Tr. at 232, 241, 246. Mr. Steel testified to the effect that Contracting Officer Koehne advised him on January 12 that if the one sentence that GSA pricing was applicable to the offer had appeared in Volume II, "Cost Information," Harris' proposal would have been acceptable. *Id.* at 232. *But see* Koehne: Tr. at 256–58. The conflicting testimony is resolved in favor of the Contracting Officer on the grounds, in addition to credibility, that other omissions, such as fixed or determinable prices for the system life, would still have existed.

**13.** Graves: Tr. at 72.

**14.** Graves: Tr. at 49–50, 64–65, 70–72; Steel: Tr. at 244, 247. As to the customized training cost information, which both witnesses conceded was missing, Mr. Steel commented, "I'm glad you asked that. The real question is, if we don't price an item . . . it's free to the Government, there's no charge to the Government. . . . What would happen in the real world is that if we were allowed to get back in, there's a very good possibility that the training would appear as a no-charge item." *Id.* at 247. Mr. Steel suggested that if other items did not appear in the GSA schedule or if they were not "in the pricing or technical where we could correlate them . . . ." they would be at no cost, as well. *Id.* at 247–48.

**15.** Tr. at 128–30.

**16.** Tr. at 144.

**17.** Tr. at 109–17.

**18.** Tr. at 226–27.

**19.** Tr. at 126.

**20.** Tr. at 134–36.

**21.** Tr. at 135–37, 158–59, 189–90, 195.

**22.** Tr. at 158–59.

**23.** Tr. at 144, 147. *The witness' testimony was* confusing. Mr. Orszak noted several technical omissions, as indicated in the Contracting Officer's January 12, 1983 letter, Tr. at 136–37, and he certainly looked at Volume III to determine if additional pricing information was present. Tr. at 147. The witness clarified that the technical data were reviewed first for completeness, not technical acceptability. Tr. at 198–99.

**24.** Tr. at 150; Koehne: Tr. at 261.

**25.** Tr. at 150, 195. Harris' "Statement of Understanding" in Volume I reads: "Pricing in effect is good for twelve (12) months and will

Contracting Officer Koehne, who did not review Harris' proposal,[26] but verified the omissions noted by Mr. Orszak [27] by reviewing Volume II, took the position that the barrier between volumes cannot be penetrated in order to derive an offeror's price.[28] If information were merely misplaced, however, it could be retrieved to render a proposal sufficiently complete.[29]

What both defense witnesses emphasized is that ADPSO could not reconstruct Harris' prices, in any event, due to, *inter alia,* missing fixed prices. With respect to GSA price information in their hands, they could not reconstruct prices after receipt of the proposal.[30] According to both, the exercise involved in extrapolating prices to Volume II from Volume III's GSA cost schedule (however ministerial) would amount to submitting prices after the proposal had been received.[31] This is true obviously with respect to fixed prices and prices for training and other line items not identical to the GSA schedule which were neither present in the schedule nor capable of being extrapolated.

The Contracting Officer addressed the issue of the distinction between allowing an offeror to revise proposals that do not conform to the requirements (with regard to either cost or technical) in contrast to deleting and replacing material within the context of section M ¶ 1. Mr. Koehne testified unequivocally that the initial technical evaluation, as with cost, is based on the submis-

sion standing alone.[32] Thus, the proposal is unacceptable if the only way to allow a cure is an additional submission. If there is no way to remedy a deficiency without resubmission, the proposal is tantamount to being late.[33] A resubmission is equivalent to a late submission in that the potential for prejudice is apparent to the proposals already in hand with respect to price. If omissions in price were allowed to be cured after submission, the confidence offerors have in the integrity of the Government's pricing system would be jeopardized.[34] Thus, Mr. Koehne characterized as "automatic" ADPSO's inability to accept Harris' revisions of its proposal because doing so would compromise the integrity of the pricing system.[35] Both defense witnesses, however, demonstrated regret in excluding from competition Harris, an otherwise qualified contractor.[36]

Mr. Orszak conceded that the initial pricing information would be superseded as a matter of course in the negotiation process, especially here given that a benchmark had been scheduled.[37] However, the court accepts the defense view that the requirements for submitting initial price data in this case were mandatory and properly should be enforced for the policy reasons relied on by the Contracting Officer.

A fair characterization of the omissions in Harris' cost proposal, as fully supported by the testimony, is that the presentation of

be based thereafter on the then current Harris G.S.A. Equipment Schedule." The court notes that this statement appears in Volume I of Harris' proposal and that the Contract Specialist considered it (although finding it insufficiently designated the required fixed prices).

26. Tr. at 223.

27. Tr. at 226–27.

28. Tr. at 259, 262.

29. Tr. at 257.

30. Koehne: Tr. at 214, 216, 252, 254–55, 258; Orszak: Tr. at 149–50, 159, 195.

31. Koehne: Tr. at 207, 212–14, 254–55; Orszak: Tr. at 142, 159, 194.

32. Tr. at 212, 254.

33. Tr. at 212–13, 255.

34. Tr. 213–17, 254. Mr. Koehne also testified that the inclusion of cost data "is one of the factors that is taken into account in interpreting the quality of the technical proposal, whether he [the offeror] understood it properly." Tr. at 207.

35. Tr. at 214.

36. Koehne: Tr. at 217, 251, 254, 258; Orszak: Tr. at 144.

37. Tr. at 167–69. Mr. Koehne acknowledged that contractors, as a general practice, rely for initial pricing on their GSA schedules. Tr. at 215.

the proposal failed to conform to the RFP's requirements. Data on at least the customized training costs were not present at all, and fixed prices could not be derived beyond September 1983. Most of the data were there, but the required information could be obtained only by extrapolation from the GSA schedule. While Harris makes much of the fact that all that would have been required to satisfy the RFP requirements was a notation to the following effect, "Maintenance and software prices are as contained in the GSA Schedule Contract Price List submitted with the proposal," and Contracting Officer Koehne admitted that he had not reviewed the GSA schedule contract price list because such a direction or incorporation by reference was absent,[38] the fact remains that an extrapolation nonetheless would have been required in order to translate the available data in the GSA schedule to the respective line items required by each exhibit. The missing fixed prices still were not accounted for other than by Mr. Graves' testimony that he would add an economic price adjustment to the GSA prices to account for future years. *See supra* note 13 and accompanying text.

In making its findings on the significance and extent of the cost omissions in Harris' proposal, the court deliberately has attempted to minimize the omissions and thereby to credit Harris with the most substantial response to the proposal that the record could support. This approach is in deference to an operative presumption,[39] yet reveals, even under a deferential reading of the testimony and review of Harris' proposal, that the omissions were (a) significant and (b) contrary to the express requirements of the RFP.

## DISCUSSION

The United States Claim Court's jurisdiction to grant declaratory judgments and injunctive relief with respect to complaints filed before a contract is awarded, *United States v. John C. Grimberg Co.,* 702 F.2d 1362 (Fed.Cir.1983) (*en banc*), was conferred by the Federal Courts Improvements Act of 1982, Pub.L. No. 97–164, § 133(a), 96 Stat. 25, 40 (1982) (the "FCIA"), and has been the subject of some 13 reported decisions by other judges of this court since exercise of that power was undertaken effective October 7, 1982.[40]

Guidance for the standards that the Claims Court should apply in exercising its new jurisdiction is found in the report to S. 1700, 97th Cong., 1st Sess. (1981), which is consistent with the legislative history on point in the House Bill ultimately enacted as the FCIA:

> By conferring jurisdiction upon the Claims Court to award injunctive relief in the pre-award stage of the procurement process, the Committee does not intend to alter the current state of the substantive law in this area. Specifically, the *Scanwell* doctrine as ennunciated by the D.C. Circuit Court of Appeals in 1970 is left intact. . . .

S.Rep. No. 97–275, 97 Cong., 1st Sess. 23, 1982 U.S.Code Cong. & Ad.News ——,

**38.** Tr. at 258–62.

**39.** DAR 32 C.F.R. § 3–805.2(a) (1982), counsels that the contracting officer shall resolve doubts as to whether a proposal is in the competitive range by including it.

Harris emphasized the size of volumes and number of pages contained in its four-volume proposal. The court notes in that regard that Volume I consisted principally of a copy of the RFP.

**40.** Seven of these decisions have addressed standards for application of the injunctive power on the merits. *P. Francini & Co. v. United States,* 2 Cl.Ct. 7, at 11–12 (1983) (WHITE, S.J.); *DeMat Air, Inc. v. United States,* 2 Cl.Ct. 197, at 201–202 (1983) (GIBSON, J.); *Big Bud Tractors, Inc. v. United States,* 2 Cl.Ct. 188, at 192–93 (1983) (WOOD, J.), *appeal noted* (Fed.Cir. Mar. 28, 1983); *Quality Furniture Rentals, Inc. v. United States,* 1 Cl.Ct. 136 at 138–139, 140–141 (1983) (KOZINSKI, C.J.); *CACI, Inc.—Fed. v. United States,* 1 Cl.Ct. 352 at 361–62 (1983) (SPECTOR, J.); *Baird Corp. v. United States,* 1 Cl.Ct. 662, at 664–65 (1983) (LYDON, J.); *Indian Wells Valley Metal Trades Council v. United States,* 1 Cl.Ct. 43 at 45–46 (1982) (WIESE, J.); *United States v. Grimberg Co.,* 1 Cl.Ct. 253 at 255–56 (1982) (WILLI, J.), *aff'd,* 702 F.2d 1362 (Fed.Cir.1983) (*en banc*).

—— (hereinafter "Senate Report"); H.Rep. 97–312, 97 Cong., 1st Sess. 44.

*Scanwell Laboratories, Inc. v. Shaffer,* 424 F.2d 859 (D.C.Cir.1970), upheld standing on the part of a frustrated bidder to sue in district court, cautioning as to the standard for adjudication:

It is indisputable that the ultimate grant of a contract must be left to the discretion of a government agency; the courts will not make contracts with the parties. It is also uncontestable that the discretion may not be abused. Surely there are criteria to be taken into consideration other than price; contracting officers may properly evaluate those criteria and base their final decisions upon the result of their analysis. They may not base their decisions on arbitrary or capricious abuses of discretion, however....

424 F.2d at 869.

The D.C. Circuit modulated its directive in *Scanwell* subsequently in *M. Steinthal & Co. v. Seamans,* 455 F.2d 1289 (D.C.Cir. 1971), and urged courts to "study these cases attentively and to exercise with restraint the power to enjoin a procurement program." 455 F.2d at 1301. Two interrelated principles were to guide judicial considerations of emergency challenges to determinations of procurement officials:

(1) [C]ourts should not overturn any procurement determination unless the aggrieved bidder demonstrates that there was no rational basis for the agency's decision; and

(2) even in instances where such a determination is made, there is room for sound judicial discretion, in the presence of overriding public interest considerations, to refuse to entertain declaratory or injunctive actions in a pre-procurement context.

*See Wheelabrator Corp. v. Chafee,* 455 F.2d 1306, 1312 (D.C.Cir.1971) (alternative to showing no rational basis for procurement official's decision on matter committed primarily to his discretion is that the procure-

ment procedure involved a clear and prejudicial violation of applicable statutes or regulations); *accord, Kentron Hawaii, Ltd. v. Warner,* 480 F.2d 1166, 1169 (D.C.Cir.1973).

In addition, pre-existing case law from the Court of Claims, *Keco Industries v. United States,* 192 Ct.Cl. 773, 428 F.2d 1233 (1970), and *Heyer Products Co. v. United States,* 135 Ct.Cl. 63, 69, 140 F.Supp. 409, 412–13 (1956), recognizes the implied promise of the request for offer "to give fair and impartial consideration" to bids in the context of suits to recover bid preparation costs: "[E]very bidder has the right to have his bid honestly considered by the Government, and if this obligation is breached, then the injured party has the right to come into court and try and prove his cause of action." 192 Ct.Cl. at 780, 428 F.2d at 1237.[41]

The Senate Report, while not specifically referring to our predecessor Court of Claims, continued: "Moreover, the Committee expects that the court will utilize the authority conferred upon it by this section only in circumstances where the contract, if awarded, would be the result of arbitrary or capricious action by the contracting officials, to deny qualified firms an opportunity to compete fairly for the procurement award...." Senate Report 23, 1982 U.S. Code Cong. & Adm.News at —— (cited with approval in *United States v. John C. Grimberg Co.,* 702 F.2d 1362 at 1374 n. 19). this passage was also highlighted by Judge Willi below in *United States v. Grimberg Co.,* 1 Cl.Ct. 253 at 255–56 (1982); Judge Spector in *CACI, Inc.—Federal v. United States,* 1 Cl.Ct. 352 at 361–62 (1983); and Chief Judge Kozinski in *Quality Furniture Rentals, Inc. v. United States,* 1 Cl.Ct. 136 at 140–141 (1983). To the extent that the Senate Report's language does not derogate from the commitment to apply then-existing case law, *see Merrill Lynch, Pierce, Fenner & Smith v. Curran,* 456 U.S. 353, 102 S.Ct. 1825, 1839, 72 L.Ed.2d 182 (1982); *Big Bud Tractors, Inc. v. United*

---

**41.** *Keco* and *Heyer* were cited with approval on point in *Airborne Data, Inc. v. United States,* 702 F.2d 1350 at 1352 (Fed.Cir.1983) (*per cu-* riam); *see United States v. Grimberg Co.,* 702 F.2d 1362 at 1367 & n. 8.

*States,* 2 Cl.Ct. 197 at 201 (1983) (WOOD, J.), *appeal noted* (Fed.Cir. Mar. 28, 1983), this is also another useful guidepost for the exercise of the Claims Court's jurisdiction.

The overall scope of the court's inquiry was summarized by Judge Lydon in *Baird Corp. v. United States,* 1 Cl.Ct. 662, at 664 (Cl.Ct.1983): "Judicial review of an agency preaward procurement decision is, and should be, extremely limited in scope." *Accord, Big Bud Tractors, Inc. v. United States,* 2 Cl.Ct. 197 at 202.

### 1. *Deviation from the Evaluation Criteria*

Harris argues, as its witnesses testified, that the clear meaning and intendment of section M ¶ 1 of the RFP was to advise offerors that all "proposals that do not conform to the requirements or those that propose exceptions to the requirements will be brought to the offeror's attention. Revised proposals which are not acceptable will not be further considered and the offeror will be notified of the unacceptability." Messrs. Graves and Steel relied on this language in believing that ADPSO would advise Harris of any deficiencies so that they could be promptly corrected. Moreover, amendment to ¶ 5 (Nov. 19, 1982), contemplated "Amendments to the Proposal":

> Changes by the offeror to his proposal shall be accomplished by submitting amended pages to the Contracting Officer. Changes from the original page shall be indicated by right and left marginal vertical lines adjacent to the change. The offeror shall include the date of the amendment at the bottom of each page. If additional pages are required, they shall contain a letter suffix (e.g.[,] 7a).

Harris charges that by deeming its proposal unacceptable based on the omissions to Volume II and by refusing to allow Harris to correct those deficiencies, ADPSO violated DAR 32 C.F.R. § 3–501(b)(3)(M)(i) (1982), which provides in pertinent part: "[W]hen an award is to be based upon technical and other factors, in addition to price or cost, the solicitation shall clearly inform offerors of (A) the significant evaluation factors, and (B) the relative order of importance the Government attaches to·price and all such other factors...." Thus, Harris argues that the announced evaluation plan obligated ADPSO to advise Harris of the deficiencies in its proposal, to provide Harris with the opportunity to revise the proposal, and to reserve a determination of unacceptability until the offeror was given an opportunity to make its revisions. ADPSO's determination of unacceptability based on an outright rejection of the incomplete cost data, according to Harris, constitutes a material deviation from the evaluation plan; therefore, pursuant to DAR 32 C.F.R. 3–505(a) (1982), the RFP should have been amended after issuance, but before the closing date for receipt of offers, because "it becam[e] necessary ... to correct a defect or ambiguity...."[42]

If this argument were accepted, Harris would have shown the requisite clear violation of an applicable procurement regulation under the test in *Wheelabrator Corp. v. Chafee,* 455 F.2d at 1312. However, the court cannot accept the predicate of this argument, which is that the quoted language of section M ¶ 1 of the RFP is ambiguous and therefore required amendment prior to the December 13 deadline for submission of proposals.

---

**42.** Harris also relies on DAR 32 C.F.R. § 3–505(c), which provides in full:

Any information given to a prospective offeror or quoter concerning a request for proposals or request for quotations shall be furnished promptly to all other prospective offerors or quoters as an *amendment* to the request, whether or not a pre-proposal conference is held, if such information is necessary to offerors or quoters in submitting pro-

posals or quotations on the request, or *if the lack of such information would be prejudicial to uninformed offerors or quoters. No award shall be made on a request for proposals unless such an amendment thereto has been issued in sufficient time to permit prospective offerors to consider such information in submitting or modifying their proposals.* (Emphasis added.)

Harris reads section M ¶ 1 to afford offerors the opportunity to correct their proposals with respect to both cost and technical components "that do not conform to the requirements or those that propose exceptions to the requirements...." This argument rests on a construction of the paragraph that the term "proposals" when not modified by the term "technical sections" or "cost sections" means both technical and cost sections. Thus, because "proposals" is not modified in the critical language, the word refers to both cost and technical proposals. Harris contends that its reading of the critical language is reasonable, that ADSPO's reading of the critical language is another reading, and that Harris' and ADPSO's different interpretations create an ambiguity compelling the required amendment.

The court rejects Harris' construction as both illogical and syntactically incorrect,[43] and deems it unreasonable as a matter of law, thereby negating any ambiguity. Rather, the court finds defendant's reading the only reasonable construction to be given to a paragraph which cannot be characterized as precise, but which falls short of being ambiguous.

The preferred construction, and the one endorsed by the court, is that the word "requirements" in the sentence immediately preceding the critical language is the referent of the "requirements" in the next sentence. Thus, the critical language deals with discussion of technical sections. The language, taken as a whole, reads thusly:

The technical sections of the proposals will be evaluated against the mandatory Government requirements set forth in Section C, Description/Specifications. Proposals that do not conform to the requirements or those that propose exceptions to the requirements will be brought to the offeror's attention. Revised proposals which are not acceptable will not be further considered and the offeror will be notified of unacceptability....

Rejection of Harris' argument grounded on ambiguity does not end the inquiry, because the language of section M ¶ 1 provides that the price and technical criteria shall be equally weighed, but at the same time allows the technical sections of proposals that do not conform to the requirements of the RFP or that propose exceptions to requirements to be remedied prior to a determination of unacceptability. Certainly, ADPSO would have infringed DAR 32 C.F.R. § 3–501(b)(3)(M)(i) if the evaluation plan had been implemented by allowing rehabilitation of proposals with omissions in the technical section equivalent in quality or quantity to Harris' omissions in the cost section of its proposal. Such treatment would have deprived Harris of full and fair consideration of its proposal. However, the evidence does not show that any offeror was given an opportunity to correct like omissions of technical information.

In its post-trial brief, Harris gives a slightly different gloss to its argument, contending that section M ¶ 1 of the RFP provides for discussions with offerors to remedy technical deficiencies and must be construed to allow discussions with respect to price deficiencies, as well.[44] The court

---

43. Harris would invite the court into a semantic and grammatical morass warned against by the D.C. Circuit in *M. Steinthal & Co. v. Seamans,* 455 F.2d at 1301 & n. 40:

[If the court does not stay its hand, assuming the court finds a reasonable basis for the agency's action,] the the courts would become the forum for all manner of objections to procurement decisions—*objections that counsel can readily relate to the language of some provision or in some other procurement regulation*—and would be propelled without adequate preparation into a tangle of complex statutory and decisional rules. The sometimes esoteric nature of this inquiry is exemplified by the references in the footnote to the contentions made in the case before us, including, *e.g., the significance of the use of capital letters for key words rather than ordinary print.*
(Footnote omitted.)

44. This reading corresponds accurately to DAR 32 C.F.R. § 3–805.3(a):

All offerors selected to participate in discussions shall be advised of deficiencies in their proposals and shall be offered a reasonable opportunity to correct or resolve the deficiencies and to submit *such price or cost, technical* or other revisions to their proposals that may result from the discussions. *A defi-*

agrees with Harris' construction of "discussions" as not confined to "negotiations." [45] Harris also correctly points out that "revisions," as the term is used in section M ¶ 1 of the RFP, contemplates "discussions," not a less significant process termed "clarifications." [46] The net result of this definitional process is not to generate an ambiguity, but to make express that ADSPO could not undertake discussions with any offeror concerning deficiencies in the technical or cost sections of a proposal without affording the same opportunity to all offerors. *Mechanical Equipment Co.*, B–173703, Feb. 7, 1972, 51 Comp.Gen. 479, 481 (1972); *see Centro Corp.; Systems Research Laboratories, Inc.*, B–186842, 77–1 CPD ¶ 375, at 5.

The problem with Harris' position is that discussions need not be initiated with any offeror if a proposal is unacceptable on an initial review: "The normal test of unacceptability requires the proposal be so far out of line in price or so technically deficient that meaningful negotiations cannot be conducted." *Centro Corp.; Systems Research Laboratories, Inc.*, 77–1 CPD ¶ 375, at 3; McBride & Wachtel, *Government Contracts*, § 9.10[14][C], at 9–71 (1983 Supp.) (one of five factors considered in determining whether exclusion of proposal from competitive range is unreasonable exercise of discretion: "How specifically did the request for proposals call for detailed information, the omission of which was relied upon by the agency in excluding the proposal from competitive range?") Section M ¶ 1 must be construed *in pari materia* with ¶ 2.C.2, which advised Harris that "offers that do not include fixed or determinable system (items) life prices cannot be evaluated for the total system life requirements and will be rejected." Thus, the section of the RFP Harris advances as countenancing correction of omitted information warns that rejection will result if one of the types of information Harris failed to submit is omitted.

Harris adduced no evidence that other offerors had been given an opportunity to submit revisions of a nature to render a proposal complete.[47] So the issue becomes whether section M ¶ 1, as applied to both the cost and technical aspects of a proposal (the two equally weighed evaluation criteria), should be construed as precluding exclusion of a proposal if no opportunity has been afforded to correct omissions by submitting revisions. Harris submits no authority to command such a reading, and it is rejected as contrary to the law on point.[48]

---

*ciency is defined as that part of an offeror's proposal which would not satisfy the Government's requirements.*
(Emphasis added.)

**45.** Both defense witnesses equated "discussions" with "negotiations." See Koehne: Tr. at 222; Orszak: Tr. at 171.

**46.** These witnesses also testified that revisions may result from "clarifications," which are not themselves "discussions." Koehne: Tr. at 219; Orszak: Tr. at 129–30.

**47.** Assuming that revisions to correct minor omissions in other offers were tolerated (as to either the cost or technical sections), *see* Tr. at 189–90, and further assuming that Harris was not given an opportunity to revise its proposal in a similar fashion, the rationality of the exclusion would be indicted. The same holds true for significant omissions. However, the precise issue involving the construction of section M ¶ 1 is not whether the Contracting Officer's discretion was exercised within permissible bounds, but whether the provision gives offerors a right to correct omissions that was denied to Harris.

**48.** Defendant argues strenuously that section 10(g) of the standard provisions of the contract, which allowed ADSPO to award the contract based on initial offerors received, put Harris on notice that deficiencies of any nature in either the cost or technical sections of its proposal could not have been remedied if ADPSO exercised its right to award based on initial proposals. Conceding that the standard form language was present, Harris' riposte was that a benchmark had been scheduled; moreover, an undertaking of this complexity and magnitude was not in "the real world" capable of being awarded on initial offers. Harris has the stronger position on this issue. Nonetheless, whether or not ADPSO could have exercised this right, the fact remains that omissions in the price and technical components of initial proposals that could only be remedied by resubmissions render initial proposals unacceptable, even though ADPSO and all offerors reasonably contemplated the subsequent process of clarifications/revisions/discussions; benchmark tests; and negotiations with a likely call for "best and final" prices.

## 2. Abuse of the Contracting Officer's Discretion in Excluding Harris' Proposal from Competition Based on Price Omissions

Because the court has found that no applicable regulation has been violated, the standards governing examination of a discretionary determination by a contracting officer as to which proposals are in the competitive range, DAR 32 C.F.R. § 3–805.-2(a), prescribe an inquiry only as to whether the contracting officer's determination was rational.

In this case the precise determination was that Harris' proposal contained significant price omissions. According to the defense witnesses, Harris' proposal could not be evaluated absent a resubmission of the missing information. The authorities recognize the distinction between "proposals which failed to furnish any information as to one or more RFP requirements, on the one hand, and proposals which respond to the RFP requirements, but merely failed to provide sufficient detail, on the other." Gallagher, *The Law of Federal Negotiated Contract Formation* 181–82 (1981), citing cases. The criteria guiding a contracting officer's determination to eliminate a proposal based on informational deficiencies include how much detail is demanded by the RFP. *See id.* at 182; McBride & Wachtel, *Government Contracts, supra, id., citing Electrospace Systems, Inc.,* No. B–192574, 58 Comp.Gen. 415, 421 (1979). The five factors considered by the GAO in determining whether agency discretion has been unreasonably exercised are

(1) how definitely the RFP has called for the detailed information, the omission of which was relied upon by the agency for excluding a proposal from the competitive range; (2) the nature of the "informational" deficiencies; (3) the scope and range of the proposal's "informational" deficiencies; (4) whether there was only one offeror in the competitive range; and (5) whether a deficient but reasonably correctable proposal represented a significant costs savings.

*Id.*

With respect to the first three criteria, the RFP is explicit that the requirements calling for the omitted information were mandatory. *See Best Western Quantico Inn/Conference Center; Cliffside Inn,* B–209500.2, Feb. 7, 1983, at 3,[49] and the court's review of Harris' proposal confirmed the omissions. Because of the omissions, Harris did not in its proposal demonstrate an understanding of what it would be required to do under the contract, because the cost section of Harris' proposal would have been rewritten in order to correct the deficiencies. Although the Contracting Officer declined to give the number of offerors in the competitive range, at least several remain. As to the last criterion, based on the omission of cost data, speculation would be involved in determining whether a deficient but reasonably correctable proposal represented a significant cost savings.

 Harris argues that, even if an initial proposal may not be fully in accord with RFP requirements, it should not be rejected if the deficiencies are reasonably subject to being made acceptable through

---

**49.** Judge Gibson in *DeMat Air, Inc. v. United States,* 2 Cl.Ct. 197, found abuse of discretion in failure to alert an offeror of an omission to his proposal. The missing information, the offeror's signature, was a mandatory requirement. *DeMat* is distinguishable on its facts from the case at bar. If it is not so viewed, this court respectfully notes its disagreement with Judge Gibson's opinion.

Much of the case law cited by defendant is inapplicable to the facts of this case. For example, in *Centurian Films, Inc.,* B–205570, Mar. 25, 1982, 82–1 CPD ¶ 285, as defendant recognizes, the deficient cost proposal was the basis for the agency's determination that the propos-

al was technically flawed. *Id.* ¶ 285, at 11. The offeror in *Tierney Manufacturing Co.,* B–209035, Dec. 20, 1982, 82–2 CPD ¶ 552, was ostracized for failing to submit a firm fixed price, but the award was made on initial proposals. In *Center for Employment Training,* B–203555, Mar. 17, 1982, 82–1 CPD ¶ 252, every aspect of the proposal was patently deficient. Defendant's best case, *Informatics, Inc.,* B–194926, July 2, 1980, 80–2 CPD ¶ 8, upheld rejection of a proposal based on omissions of technical information and noted that cost need not be considered before a proposal is rejected due to omission of material technical information.

negotiations. *E.g., NCR Corp.,* B–194633, Sept. 4, 1979, 79–2 CPD ¶ 174. The hurdle is that the determination of unacceptability rests within the Contracting Officer's discretion and must be upheld if rational. Harris does not challenge the omissions, but takes the position that because of the relatively modest effort required to conform its proposal to the requirements, the Contracting Officer exceeded his discretion. Because the Contract Specialist, whose determination was approved by the Contracting Officer, concluded that the omissions were significant, that the GSA price schedule was not identified for missing price data, that training and fixed cost information could not be extrapolated from the GSA schedule, and that the GSA schedule did not conform to all the line items in the RFP, the court cannot find that the determination of unacceptability lacked a rational basis.[50]

### CONCLUSION

For the reasons stated, on the merits Harris is not entitled to a declaratory judgment. Defendant's motion for summary judgment is denied as moot, as is Harris' cross-motion for summary judgment. Harris' motion for preliminary injunction consequently is denied, and the complaint will be dismissed.

IT IS SO ORDERED.

Costs to the prevailing party.

---

**50.** For purposes of judging rationality, the court has treated the omissions as a whole. An opinion is not expressed on the exercise of the Contracting Officer's discretion if, other omis-

sions being the same, Harris' proposal had contained the one-sentence cross reference to the GSA price schedule. *See supra* note 12.